# United States Court of Appeals

*for the*

# Eleventh Circuit

CASE NO.: 25-10034

HAROLD DOMBROWSKI,
Plaintiff/Appellant,

v.

CHATARA WILSON, SELENA COBB, QUASHONIA JELKS,
Defendants/Appellees.

_

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE DIVISION
CASE NO.: 3:21-cv-1199-WWB-PDB

INITIAL BRIEF OF PLAINTIFF-APPELLANT

**JAMES V. COOK, ESQ.**
Florida Bar No. 0966843
**LAW OFFICE OF JAMES COOK**.
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 222-8080; (850) 561-0836 fax
cookjv@gmail.com

For Plaintiff-Appellant Harold
Dombrowski

**A.** **Certificate of Interested Persons and Corporate Disclosure Statement**

Pursuant to Eleventh Circuit Rule 26.1-1, the following is an alphabetical list of persons and entities with any known interest in the outcome of this appeal:

1. Barksdale, Hon. Patricia, Magistrate Judge, Middle District of Florida;

2. Berger, Hon. Wendy, District Court, Middle District of Florida;

3. Cobb, Selena, Appellee, Appellee;[1]

4. Cook, James V., Esq., Counsel for Plaintiff/Appellant;

5. Dombrowski, Harold, Plaintiff/Appellant;

6. Jelks, Quashonia, Appellee, Appellee;

7. Law Offices of James Cook, Counsel for Plaintiff/Appellant;

8. Office of the Attorney General, counsel for Appellees/Appellees;

9. Taylor, Broderick, Counsel for Appellees, Chatara Wilson, Selena Cobb, Quashonia Jelks, Appellees/Appellees.;

10. Wilson, Chatara, Appellee, Appellee;

---

[1] Selena Lumpkin Cobb was hired as a Vocational Instructor in Food Service in 2016. At that time, she was referred to and signed her name as Selena Lumpkin Cobb (no "s") in 2016. Her Driver's License and Social Security Card showed her family name as "Cobb." Sometime in 2017, she began referring to herself and signing her name as "Cobbs." The Florida Department of Corrections (FDC) accommodated the name change although her identification on file all reflected her name as "Cobb." Appellant will refer to her as "Cobb."

**B.** **Statement Regarding Oral Argument**

Appellant does not believe that oral argument is necessary in this case. However, Appellant will gladly participate in oral argument should the Court determine that it would be appropriate in this case.

# C.     Table of Contents

|  |  | Page |
|---|---|---|
| | TITLE PAGE | i |
| A. | CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT | ii |
| B. | STATEMENT REGARDING ORAL ARGUMENT | iii |
| C. | TABLE OF CONTENTS | iv |
| D. | TABLE OF AUTHORITIES | vi |
| | a. Cases | vi |
| | b. Statutes | viii |
| | c. Rules | viii |
| E. | STATEMENT ON ADOPTING BRIEFS OF OTHER PARTIES | 1 |
| F. | STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION | 1 |
| | 1. Basis for subject matter jurisdiction in district court and citations to applicable statutory provisions. | 1 |
| | 2. Basis for jurisdiction in the Court of Appeals with citations to applicable statutory provisions and relevant filing dates | 1 |
| G. | STATEMENT OF THE ISSUES | 1 |
| H. | STATEMENT OF THE CASE AND FACTS | 2 |
| | 1. Course of the Proceedings and Disposition Below | 2 |
| | 2. Statement of the Facts | 3 |
| | 3. Standard of Review | 13 |
| I. | SUMMARY OF ARGUMENT | 13 |
| J. | ARGUMENT AND CITATIONS OF AUTHORITY | 17 |

I. **The District Court Erred in Failing to Consider Appellees' Coercive Conduct in Forcing Dombrowski to Work without Safety Boots with Affirmative Threats of Confinement and Loss of All Gain Time as Constituting Deliberate Indifference toward a Known Risk of Serious Harm, Obduracy, Wantonness, and Not Just Ordinary Lack of Due Care for Prisoner Safety.**    17

II. **The District Court Erred in Failing to Acknowledge Competent Evidence that Appellees Were Deliberately Indifferent in Creating a Risk of Serious Physical Harm and Failing to Mitigate the Harm by Waiting Hours to Access Medical Help.**    26

III. **The District Court Erred in Failing to Send This Case for Determination by a Jury Where Appellees Have Disputed Virtually Every Material Fact Alleged by Appellant.**    33

IV. **The District Court Erred in Finding that the Risk to Which Appellees Exposed Dombrowski Did Not, as a Matter of Law, Constitute a "Risk of Serious Harm" under Constitutional Law, Such that Appellees Are Entitled to Qualified Immunity.**    36

K. CONCLUSION    42

L. CERTIFICATE OF COMPLIANCE    42

M. CERTIFICATE OF SERVICE    42

**D. Table of Authorities**

**a.    Cases**                                                           Page

*Adams v. Poag*, 61 F.3d 1537 (11th Cir.1995)                             17

*Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700 (11th Cir. 1985)    33

*Ash v. Landrum*, 819 Fed.Appx. 770 (11th Cir. 2020)                     41

*Barefield v. Dunn*, 688 F. Supp. 3d 1026 (M.D. Ala. 2023)               26

*Berry v. Bunnell*, 39 F.3d 1056 (9th Cir.1994)                          27

*Bowden v. Stokley*, 576 Fed.Appx. 951 (11th Cir. 2014)                  41

*Bozeman v. Orum*, 422 F.3d 1265 (11th Cir. 2005)                        31

*Brooks v. Warden*, 800 F.3d 1295 (11th Cir. 2015)                       37-38

*Brown v. Hughes*, 894 F.2d 1533 (11th Cir. 1990)                        32, 38

*Chandler v. Crosby*, 379 F.3d 1278 (11th Cir.2004)                      25

*Choate v. Lockhart*, 7 F.3d 1370 (8th Cir. 1993)                        17

*Edwards v. Gilbert*, 867 F.2d 1271 (11th Cir.1989)                      38

*Farmer v. Brennan*, 511 U.S. 825 (1994)                                 20, 21, 22, 25, 26

*Fennell v. Gilstrap*, 559 F.3d 1212 (11th Cir. 2009)                    41

*Goodman v. Kimbrough*, 718 F.3d 1325 (11th Cir. 2013)                   20

*Gregg v. Georgia*, 428 U.S. 153 (1976)                                  41

*Hardin v. Hayes*, 52 F.3d 934 (11th Cir. 1995)                          21

*Harris v. Coweta County*, 21 F.3d 388 (11th Cir. 1994)                  31, 32, 40

*Herbert v. Miller*, CV 619-052 (S.D. Ga. Mar. 14, 2022)                42

*Lancaster v. Monroe County, Ala.*, 116 F.3d 1419 (11th Cir. 1997)      32, 40

*Lane v. Philbin*, 835 F.3d 1302 (11th Cir. 2016)                       19

*Lee v. Sikes*, 870 F. Supp. 1096 (S.D. Ga. 1994)                       17, 26

*Mandel v. Doe*, 888 F.2d 783 (11th Cir. 1989)                          32, 33, 40

*Marbury v. Warden*, 936 F.3d 1227 (11th Cir. 2019)                     20, 21

*Melton v. Abston*, 841 F.3d 1207 (11th Cir. 2016)                      33

*Monell v. Dep't of Soc. Servs.*, 436 658 (1979)                        25

*Nelson v. Tompkins*, 89 F.4th 1289 (11th Cir. 2024)                    22

*Ort v. White*, 813 F.2d 318 (11th Cir. 1987)                           17

*Phelps v. Duncan*, 2018 WL 325201 (N.D. Fla. Jan. 8, 2018)            25

*Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313    20, 37
(11th Cir. 2005)

*Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010)                       13

*Randles v. Hester*, 2001 WL 1667821 (M.D. Fla.)                        19

*Ray v. Mabry*, 556 F.2d 881 (8th Cir. 1977)                            18, 26, 27

*Reid v. Streit*, 697 Fed.Appx. 968 (11th Cir. 2017)                    33

*Rodriguez v. Asencio*, No. 3:17cv155-RV-HTC (N.D. Fla. 2019)           33

*Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611 (11th Cir. 2007) 21, 22

*Skrtich v. Thornton*, 280 F.3d 1295 (11th Cir. 2002)                   41

*Steele v. Shah*, 87 F.3d 1266 (11th Cir. 1996)                         33

*Swint v. City of Wadley, Ala.*, 51 F. 3d 988 (11th Cir. 1995)    22

*Wade v. McDade*, 106 F.4th 1251 (11th Cir. 2024)    20, 21

*Waldrop v. Evans*, 871 F.2d 1030 (11th Cir. 1989)    33

*Whitley v. Albers*, 475 U.S. 312 (1986)    17

*Williams v. Norris*, 148 F.3d 983 (8th Cir. 1998)    18-19, 26

**b.    Statutes**

28 U.S.C. § 1291    14

28 U.S.C. § 1331    14

28 U.S.C. § 1915    25

42 U.S.C. § 1983    1, 2

**c.    Rules**

Eleventh Circuit Rule 28-5    1

Fed.R.App.P. 32    42

**d.    Other**

33-601.301 FAC    14, 28

33-601.314 FAC    6, 14, 28

### E. Statement on Adopting Briefs of Other Parties

Appellant does not adopt the briefs of other parties.

### F. Statement of Subject Matter and Appellate Jurisdiction[2]

#### 1. Basis for subject matter jurisdiction in district court

The district court had jurisdiction over the federal constitutional claims brought by Appellants under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331.

#### 2. Basis for jurisdiction in the Court of Appeals

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. On October 17, 2024, the district court granted Appellee's motion for summary judgment. (ECF 105). Judgment was entered October 18, 2024 (ECF 106). The notice of appeal was late-filed on January 2, 2025, (ECF 113), by leave of the district court granted on December 26, 2024. (ECF 112).

### G. Statement of The Issues

1. Whether Appellees are liable for violation of the Eighth Amendment for forcing Appellant to perform dangerous tasks without safety gear by threatening to have him put in confinement and deprived of gain time.

2. Whether Appellees are liable for violation of the Eighth Amendment for failing to summon medical assistance for hours.

---

[2] Pursuant to Eleventh Circuit Rule 28-5, references to the record on appeal will be "ECF" for Docket Entry, followed by the appropriate document number, followed by "at," followed by the respective page number (if appropriate).

3. Whether the Court erred in failing to send the case to a jury where Appellees disputed virtually all Appellant's allegations.

4. Whether the Appellees were entitled to qualified immunity.

## H. Statement of The Case and Facts

### 1. Course of the Proceedings and Disposition Below

This case was brought by Appellant, *pro se*, under 42 U.S.C. § 1983 on December 3, 2021, in the District Court, the Middle District of Florida, Jacksonville Division. (ECF 1). On August 9, 2022, Appellees Wilson, Cobb, and Jelks, filed a Motion to Dismiss (ECF 18). On March 8, 2023, the Court entered an Order finding that Appellant had adequately pled a cause of action for deliberate indifference to a risk of harm from a serious physical injury as to the Appellees. (ECF 38 at 9). Medical Appellees, with whom Appellant subsequently settled, filed a Motion to Dismiss on November 14, 2022 (ECF 33) and were also denied dismissal by the district court in the same Order. (Id. at 11).

On June 18, 2024, Appellees filed a Motion for Summary Judgment, (ECF 87), arguing that Appellant failed to establish a constitutional violation and that the Appellees were entitled to Qualified Immunity. (Id. at 1).

On October 17, 2024, the district court entered an Order granting the motion for summary judgment as to the appellees on the basis of qualified immunity (ECF 105). On October 18, 2024, the Clerk entered final judgment for Appellees. (ECF

106). On November 12, 2024, Appellant attempted to file a Notice of Appeal, but for an unknown reason, the filing effort only registered on-line to the extent that payment of the appellate filing fee was reflected in the system. On December 13, 2024, Appellant moved, unopposed, for an extension of time to file his Notice of Appeal. (ECF 110). On December 26, 2024, the district court entered its Order granting the motion and extending the time to file a Notice of Appeal within 14 days of the date of the Order. (ECF 112). On January 2, 2025, Appellant filed his Notice of Appeal as ordered by the district court. (ECF 113).

## 2. Statement of the Facts.

In August of 2020, Appellant Harold Dombrowski, a prisoner at Hamilton Annex in Jasper, Florida, was assigned to work in food service as a cook. (ECF 97-1, Dombrowski Declaration, at ¶¶ 1-2). At that time, Despite his requests, Dombrowski had not been provided with work boots. (Id. at ¶ 3). The work boots were required safety gear[3] that had non-skid soles to prevent slip and falls on wet, slippery floors, as well as protection from splashing hot liquids, while working in

---

[3] On June 3, 2021, Hamilton C.I. Assistant Warden Elizabeth Mallard responded to Harold Dombrowski's grievance regarding the failure to provide him with safety work boots as follows:

> Amended response: Further investigation reveals the following information provided by Food Service Director at Hamilton C.I.: Inmate uniforms including boots are inspected prior to entering food service, in-mates are required to wear proper footwear while working in food service, any inmates that report to food service without the proper attire including footwear are sent back to the dorm and required to return in proper dress code. No inmates are allowed or forced to work without proper footwear in food service.

(ECF 97-3, Assistant Warden Mallard response to Grievance 2103-209-132).

the kitchen.[4] In her deposition, Appellee Cobb said that kitchen workers are "not supposed to work in the kitchen without boots. (87-7, Cobb Deposition, at 30:10-14). Appellee Cobb admitted the work boots used in the kitchen were designed not to slip, (97-4, Requests for Admissions to Cobb, at ¶ 12), and were required. (ECF 87-7 at 22:12-14). But she denied that "kitchen workers in Florida prisons are normally provided with work boots." (ECF 97-4 at ¶ 11).

As to whose job it was to enforce the rule, Appellee Cobb pointed to Appellee Food Service Director Wilson and Appellee Kitchen Security Officer Jelks. At deposition, Appellee Cobb testified as follows:

> Q. Okay. What kind of footwear do people wear when they worked in the kitchen?
>
> A. They're supposed to have on boots.
>
> Q. Okay. But other than what they're supposed to have, what did they actually have?
>
> A. Well, when they come in on Crocs, the officer [Appellee Jelks][5] is supposed to let them out to go to laundry or somewhere to get something different.

---

[4] Appellant recalled speaking to all three Appellees about the need for boots, Cobb, Jelks, and Wilson. At deposition, Dombrowski was questioned about who he talked to.
  Q.· ·Did you mention anything about a prior injury?
  A.· ·Yes.
  Q.· ·Did you request the boots again?
  A.· ·Yes, I did.
  Q.· ·What did they say?
  A.· ·They didn't have any, work.
(87-1 at 20-25). It should be noted that when he had to work in crocs the previous year and suffered an injury, he was provided with safety boots the very next day.
[5] Appellee Cobb admits Appellee Jelks was a sworn correctional officer. (ECF 97-4 at ¶ 5).

Q. Okay. So if somebody shows up in a pair of Crocs, the officer who works in the kitchen has them go and get appropriate footwear for the -- for working in the kitchen, right?

A. Yes, sir.

Q. Okay. Because there's a lot of hot boiling water and hot food and slippery floors, right?

A. Yes, sir.

Q. Okay. Is that -- is that a common thing that prisoners working in the kitchen come in wearing Crocs?

A. They come in wearing Crocs, but they're always told they have to go back.

Q. Okay. And what happens when the -- when laundry runs out of boots?

A. I don't know.

Q. They can't work in the kitchen, right?

A. Right.

Q. Okay. So if they don't come in with the right footwear, then they can't work?

A. They're not supposed to, sir.

(ECF 87-7, Cobb Deposition, at 18:7-19:9). As to enforcement of the rules, she

testified as follows:

Q. They're talking about how you -- how worker supervisors are supposed to ensure that foot protection and personal protective equipment is cleaned and stored.

A. Oh, yeah. Yes, sir.

. . . .

Q. Okay. So the only worker supervisor that you know of around that time was Ms. Wilson; is that correct?

A. Yes, sir. Ms. Wilson didn't handle anything like that, though. That -- that falls on security, not Ms. Wilson.

Q. Okay. Well, back then they didn't have boots in the kitchen, right?

A. No -- no, sir.

. . . .

Q. Okay. But if -- but if the food service director was there, she would have to make sure that everybody was wearing the right footwear, right?

A. All she would do was tell security that this one doesn't have on boots, and they would have to take care of it.

Q. Okay. Understood.

A. Okay.

Q. But she would be -- she would be the one to give the orders?

A. Yes, sir. She would tell them.

(ECF 87-7, Cobb Deposition at 31:5-32:7)

Appellant Dombrowski repeatedly told Food Service Director Wilson that he had no safety boots and her job was to make sure he didn't work in the kitchen without them. Her response was, "I don't have time for this shit." (ECF 97-1 at ¶ 4). Dombrowski tried his best to follow the rules and as a result, he was threatened with confinement and having to spend longer in prison than if he ignored them.[6]

---

[6] The evidence is not that Dombrowski "could" get a disciplinary report, be sent to confinement and lose all his gain time but that he "would" receive those consequences. (ECF 97-1 at ¶ 3). He was aware that Jelks, as a sworn corrections officer, could issue a Disciplinary Report for Failure to Obey an Order. Dombrowski believed he could receive 60 days confinement for Disobeying a verbal or written order (Violation 6-1. 33-601.314, Section 6, FAC). Actually, that section can result in 30 days Disciplinary Confinement and loss of up to 60 days gain time. But this can be repeated for each refusal so if he continued to refuse, he could eventually lose all gain time.

Ultimately, he had to wear state-issued resin shoes (crocs) that offered no protection from the wet slippery floors. Dombrowski had already fallen once on December 24, 2019, working without safety footwear. Dombrowski was injured but fortunately, his injury was not serious. (ECF 97-1 at ¶ 1). Although he was not provided with safety boots at first, the very next day after his first injury back in 2019, Appellant was provided with safety work boots by Food Service staff. (ECF 97-1 at ¶ 1). Months later, he was back to being ordered, under pain of an extended incarceration, to work as a cook without safety boots.

In July 2020, a COVID 19 outbreak occurred among the food service workers and the dormitory where most of them slept was placed under quarantine. All the food service workers in the dorm, including Appellant, were required to turn in their boots so that they could be re-issued to the replacement food service workers. (Id. at ¶ 2). On September 10, 2020, Appellant was told to report to Food Service to work as a cook. Appellant met with the Corrections Officer assigned to Food Service Quashonia Jelks and Food Service Supervisor Appellee Selena Cobb. Kitchen workers were told they had to follow her instructions. (Id.).

## A. Dombrowski Was Forced by Coercive Threats of Confinement and Loss of Gain Time Credits Delaying Release from Prison to Work without Safety Gear Despite a Known Risk of Serious Harm.

Dombrowski explained to Supervisor Cobb and Corrections Officer Jelks that he needed safety boots to work in the kitchen and that it was a dangerous job

made more dangerous when inmates working around the cook pots lacked proper footwear. Appellee Cobb told Appellant he was the only cook they had and would be cooking three meals a day for about 1000 inmates. He explained he needed safety boots for that job but Cobb and Jelks told him he wouldn't get any and would have to work without safety boots. Dombrowski told Supervisor Cobb and Officer Jelks that he would not cook unless he got the safety boots. (Id. at ¶ 3).

Dombrowski reminded Supervisor Cobb and Officer Jelks that he had previously suffered a bad fall trying to work in the resin shoes (crocs). Supervisor Cobb and Officer Jelks became angry and told him if he refused to work, he would be given a disciplinary report, be sent to confinement and lose gain time.[7] Dombrowksi knew that Officer Jelks had the authority to write disciplinary reports and "refusal to work" was a serious disciplinary violation. Dombrowski was serving a 30-year sentence and he couldn't afford to lose his gain time and spend years longer in prison. (ECF 97-1 at ¶ 3).

Dombrowski tried one more time to avoid having to work in the kitchen without safety boots by taking the issue to Food Service Director Chatara Wilson

---

[7] "Refusal to Work" could be punished by confinement or loss of gain time. Disciplinary rules and procedures as set forth in the Florida Administrative Code (FAC) are incorporated into the FDC staff training program (33-601.301(4) FAC) and are required to be provided to all inmates. (33-601.301(5) FAC). Disobeying a verbal or written order (Violation 6-1. 33-601.314, § 6, FAC) can result in 30 days Disciplinary Confinement and loss of up to 60 days gain time. This punishment can be repeated for each refusal. Insufficient Work (9-13) or Refusal to Work (9-16) can be punished by up to 30 days DC and 30 days loss of GT for each occurrence, depending on the time elapsed since the last violation. (33-601.314, § 11 (FAC).

who was over the Food Service for both the Hamilton Correctional Institution Main Unit and the Hamilton Annex, where Dombrowski was assigned. Dombrowski explained his dilemma involving the risk of harm to Director Wilson. Wilson dismissed Appellant's plea for safety boots with the angry retort, "I don't have time for this shit." (Id. at ¶ 4). Wilson had the final word. At this point, Dombrowski had run out of options and agreed to work as a cook in the prison kitchen without safety boots. (Id.).

**B. Food Service Staff, Including Appellees, Were in Charge of Enforcing the Rule to Provide Kitchen Workers with Safety Boots that Gave Notice of a Risk of Serious Harm so that Appellees Violated Florida Department of Corrections Safety Rules to Abate the Risk of Harm**

Safety work boots are required where needed in hazardous work environments. (ECF 97-2, FDC Safety Manual). Those work environments include the prison kitchen. Working without safety boots or forcing prisoners to work without safety boots violated Florida Department of Corrections Safety Rules. Assistant Warden Elizabeth Mallard responded as follows to Appellant's Grievance Appeal complainint about being denied safety boots as follows:

> Amended response: Further investigation reveals the following information provided by Food Service Director at Hamilton C.I.: Inmate uniforms including boots are inspected prior to entering food service, inmates are required to wear proper footwear while working in food service, any inmates that report to food service without the proper attire including footwear are sent back to the dorm and required to return in proper dress code. No inmates are allowed or forced to work without proper footwear in food service.

(ECF 97-3 at 1).

Unfortunately, Assistant Warden Mallard was misinformed about the state of compliance at her prison with safety rules applying to Food Service staff. In Appellant's first deposition, the following exchange was had with Appellees' counsel regarding the need for safety boots in the kitchen:

Q. At that time [after his first fall in 2019] did you ever ask for the boots again?

A. Yes. Before I even started to work, I let them know that, "listen, we've had this incident before with me working in there with Crocs on. Crocs are very dangerous in our food service.· I'm not working." They said, "No, you are working."

(ECF 87-1, Dombrowski Depo 1 at 17:4-10). Dombrowski said he spoke repeatedly to Appellees Cobb, Jelks, and Wilson – all three – about his prior injury and his need for boots. (Id. at 17:17-25). Appellees, the three prison staff who controlled the work environment refused to provide Dombrowski with boots and the threat to put Dombrowski in confinement and take away all his gain time was never rescinded. Dombrowski continued to be forced to work in the kitchen without safety boots with severe and life-altering consequences. (ECF 97-1 at ¶ 4).

Dombrowski explains that he had to cook food in 80-gallon pots with spouts at the bottom so when they release the hot food "it splashes" and the crocs are full of holes and the hot food is burning his feet and he says he is "steadily complaining" and the Appellees aren't listening. (ECF 87-1 at 18:12-24). The floors are slick. Several other kitchen workers have slipped and fallen in the

kitchen, all of them wearing the standard prison crocs. (Id. at 19:7-18).

**C. After Appellant Fell, Suffered a Broken Hip, Appellees Ignored Appellant for as Long as Five Hours, as He Cried with Pain, Prostrate in the Kitchen Area, and Failed to Secure Medical Help or Transport Him to the Medical Department.**

On September 13, 2020, at approximately 4:30 a.m., while stirring oatmeal in huge kettles on a slippery floor, wearing only slick-soled resin shoes, Appellant slipped and fell hard on his right side, felt tremendous pain and was unable to rise and walk. Dombrowski believed that he fell around 4:00 a.m. but it could have been as late as 5:15 a.m. He asked Officer Jelks to call medical. She said she would but apparently failed to do so. After 30 minutes went by, Dombrowski asked Officer Jelks again and she said Medical would come. (Id. 1 at 21:7-23). Two inmates, Jesus Vega-Marrero and Iris Anderson, helped Dombrowski by moving him to the dining area where count was being held. (Id. at 23:13-20).

As hours passed, he asked both Cobb and Jelks to get him help but "they did nothing," They minimized his injuries and took no action to help him. Appellant testified at deposition, "They just kind of blew me off." (Id. at 22:14-23). "Well, by this time I'm crying because I'm in that much pain.· I'm in – I mean, now the pain is not -- the pain was bad when I fell, but 30 minutes later it was -- it was getting worse, and within the hour, I was -- it was -- it was too much.· It was way too much for me." (Id. at 23:3-7). Other inmates in the kitchen complained to

Appellees Cobb and Jelks that Dombrowski was obviously in severe pain and was not getting any help. complaining that, "Hey, man, this guy is hurt. Nobody is doing nothing." (Id. at 24:5-12), The complaints apparently had no effect.

To Appellant's knowledge, medical was finally alerted when an inmate called out to Sgt. Jackie Morgan who was doing rounds outside the chow hall. (97-1, Dombrowski Declaration at ¶ 6). Sgt. Morgan entered the kitchen, got on the radio and called medical for a stretcher. Appellant extrapolates that Medical arrived around 10:00 a.m. since his earliest medical examinations were begun around 10:15 a.m. (ECF 97-6 at 1). When medical did come, a nurse took him out on a gurney with a backboard to keep him immobile. (ECF 97-5, Fongeallaz deposition at 11:21-12:5). The earliest medical record shows 10:15 a.m. (ECF 97-6, Pain Protocol at 1). Most witnesses agree that Appellant waited hours in pain before help arrived. Later, in deposition, Nurse Fongeallaz confirmed that Dombrowski was wearing crocs at the scene. (97-5, Fongeallaz Depo at 12:6-8). Appellant was placed on a gurney with a backboard and taken to Medical. (Id. at 2:21-3:5).

Appellant had an x-ray showing the femoral neck was displaced. There was a need for a total hip replacement. (ECF 97-7, Light Expert Report at 3). His expert orthopedist, Ronald Light, MD, testified a lesser surgical intervention was not possible based on the displacement, which indicates an actual separation of the

parts of the bone. (Id. at 4, ¶ 4). Light stated that the hip replacement will probably have to be redone during Appellant's lifetime. (Id. at 5, ¶ 6).

### 3.    Standard of Review.

An appellate court reviews a district court order granting a motion for summary judgment de novo, "applying the same standard as the district court." *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010).

## I.  Summary of the Argument

Appellant was an inmate who served as the cook for the prison, working long hours, cooking three meals a day for a thousand inmates. Even after once being injured in a fall, working in slick-soled "Crocs" in a job documented as requiring safety boots, being threatened with confinement and loss of gain time by the Appellees if he refused to work in unsafe conditions, Appellant reluctantly began to work, as ordered, in a hot, wet, kitchen, stirring 80-gallon pots of oatmeal.

In the Florida prison system, confinement was essentially a prison within a prison where inmates were locked up for at least 23 hours a day. Even more to the point, loss of gain time would have meant years more prison time added to his  30-year sentence. Although Appellees deny they had the power to write a disciplinary report for "Refusal to Work" or that the charge could be punished by confinement or loss of gain time, the Florida Administrative Code establishes facts to the contrary. The disciplinary rules and procedures as set forth in the Florida

Administrative Code (FAC) are incorporated into the FDC staff training program (33-601.301(4) FAC) and are required to be provided to all inmates. (33-601.301(5) FAC). Disobeying a verbal or written order (Violation 6-1. 33-601.314, Section 6, FAC) can result in 30 days Disciplinary Confinement and loss of up to 60 days gain time. This can be repeated for each refusal. Insufficient Work (9-13) or Refusal to Work (9-16) can be punished by up to 30 days DC and 30 days loss of GT for each occurrence, depending on the time elapsed since the last violation. (33-601.314, Section 11). So the penalties for a continuing resistance to a work assignment are effectively infinite.

Prison work assignments are conditions of confinement subject to scrutiny under the Eighth Amendment. Eighth amendment principles apply not only to judicially imposed punishments, but also when conditions of confinement constitute the punishment at issue. The Eighth Amendment's prohibition against cruel and unusual punishment forbids knowingly compelling inmates to perform work beyond their strength, dangerous to their lives, or health or unduly painful. A prison official may be held liable under the Constitution for acting with "deliberate indifference" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and with such knowledge disregards that risk by failing to take reasonable measures to abate it.

Deliberate indifference has three components—evidence of: (1) a substantial

risk of serious harm; (2) deliberate indifference to that risk; and (3) causation. To prevail, an inmate must show conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety. A plaintiff can make this showing by demonstrating either a "general threat" to inmates based on dangerous conditions in the prison or particular area of the prison, or by an individualized risk based on a "specific threat" to the prisoner. Dombrowski faced a specific threat because he was not just a kitchen worker but the cook who worked directly with 80 gallon cauldrons with downspouts that splashed hot liquids on the smooth floor, creating a special zone of risk right where he worked.

The first element of an Eighth Amendment claim—a substantial risk of serious harm—is assessed under an objective standard. To establish the second element—deliberate indifference—a plaintiff must provide evidence that the defendant: (1) was subjectively aware that the inmate was at risk of serious harm; (2) disregarded that risk; and (3) acted with subjective recklessness as used in the criminal law. Subjective awareness requires that the defendant must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. The determination of whether a risk has been disregarded is objective: The [defendant] must have responded to the known risk in an unreasonable manner. Persons who are charged with enforcing the safety rules have a special basis of notice through their job assignment.

To sustain a claim, a plaintiff must show that the challenged conduct was very unreasonable in light of a known risk of harm or suffering. Whether an officer was aware of a risk of serious harm may be deduced from circumstantial evidence, including whether or not the risk was obvious. Finally, the plaintiff must show a necessary causal link between the defendant's failure to act reasonably and the plaintiff's injury. This causal connection requires that the defendant (1) had the means substantially to improve the inmate's safety, (2) knew the actions he undertook would be insufficient to provide the inmate with reasonable protection from harm, and (3) had other means available to him which he nevertheless disregarded. The connection may be personal participation, improper policy, or the lack of a policy. Prison officials violate the Eighth Amendment through unnecessary and wanton infliction of pain.

Here, when Appellant fell, unable to rise, and crying with pain, Appellees Cobb and Jelks, both physically present at the time, failed to take any affirmative action to secure medical help for Appellant but left it to other inmates to try to care for him, carrying him out of the kitchen onto a bench, while he cried with pain.

It is unclear how long Appellant would have lain in agony waiting for medical help had inmates not called out to Sgt. Morgan, doing his rounds. His efforts were closely followed by a nurse with a gurney and backboard. (ECF 88-2, Nurse Fongeallaz Deposition, at 12:1-5). Nurse Fongeallaz noticed the fact that

Appellant Dombrowski was "wearing Crocs" on his feet. (Id. at 12:6-8).

The district court erred in ignoring the coercive factor in the Appellees' response to Appellant's plea for safety footwear. The district court likewise disregarded the patent contradictions in Appellee's version of the facts, including numerous unqualified and unamended denials in their responses to Appellant's requests for admissions.

## J.  Argument and Citations

**I. The District Court Erred in Failing to Consider Appellees' Coercive Conduct in Forcing Dombrowski to Work without Safety Boots with Affirmative Threats of Confinement and Loss of All Gain Time as Constituting Deliberate Indifference toward a Known Risk of Serious Harm, Obduracy, Wantonness, and Not Just Ordinary Lack of Due Care for Prisoner Safety.**

Prison work assignments are "conditions of confinement subject to scrutiny under the Eighth Amendment." *Lee v. Sikes*, 870 F. Supp. 1096, 1099 (S.D. Ga. 1994) (citing *Choate v. Lockhart*, 7 F.3d 1370, 1373 (8th Cir. 1993)); see also *Ort v. White*, 813 F.2d 318, 321 (11th Cir. 1987). Deliberate indifference involves more than "inadvertence or error in good faith." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Deliberate indifference involves the "obduracy and wantonness" of conduct that does not suggest a failure to meet the mark but a mocking disregard of inmate life and safety. *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir.1995); see also *Whitley*, 475 U.S. at 319 ("To be cruel and unusual punishment, [the challenged] conduct ... must involve more than ordinary lack of due care for the

prisoner's interests or safety.").

This case involves three prison staff members working in the food service, at least two of whom, Wilson and Jelks, were assigned to make sure that no one worked in the kitchen without proper safety gear including non-skid safety boots. Competent testimony exists on which a jury could reasonably find that all three Appellees threatened to have Appellant Dombrowski placed in confinement and deprived of all his gain time, resulting in prolonging his release from prison, because he insisted on following the rules relating to workplace safety that they were assigned to monitor and enforce. Dombrowski worked as a cook at 80-gallon cauldrons of hot liquid with spouts at the bottom that spewed liquid over the slippery floor. All Dombrowski had on his feet were a pair of slip-on "crocs" with slick wet soles that made every movement a close call. He had slipped and been injured just months earlier and had seen several other kitchen workers wearing "crocs" fall as well. When he made a final appeal for a pair of non-skid safety boots – which were required footwear for kitchen workers – after multiple denials, Food Service Director Wilson responded, "I don't have time for this shit."

The Eighth Amendment's prohibition against cruel and unusual punishment forbids knowingly compelling inmates to perform work beyond their strength, dangerous to their lives, or health or unduly painful. *Ray v. Mabry*, 556 F.2d 881, 882 (8th Cir. 1977) (per curiam); *Williams v. Norris*, 148 F.3d 983, 987 (8th Cir.

1998); *Lee*, 870 F. Supp. at 1100. *See also Randles v. Hester*, 2001 WL 1667821

*1 (M.D. Fla.) (Motion to dismiss denied where defendant forced plaintiff, under

threat of discipline, to clean up blood spills without protective clothing or safety

gear contrary to clearly established Eighth Amendment proscription of exposure of

inmates to obviously dangerous conditions). In *Randles*, the district court held that:

> [W]hen the State by the affirmative exercise of its power so restrains an
> individual's liberty that it renders him unable to care for himself, and at the
> same time fails to provide for his basic human needs-e.g., food, clothing,
> shelter, medical care, and reasonable safety – it transgresses the substantive
> limits on state action set by the Eighth Amendment and the Due Process
> Clause.

*Id.* "The first element of an Eighth Amendment claim—a substantial risk of serious

harm—is assessed under an objective standard." *Lane v. Philbin*, 835 F.3d 1302,

1307 (11th Cir. 2016). Here, the fact that Harold Dombrowski was forced to work

with huge cooking vessels on a wet, slippery floor with slippery shoes rather than

the non-skid work boots that he was supposed to be provided, such that he fell and

broke his hip, requiring a total hip replacement, satisfies the objective element.

Deliberate indifference requires a subjective knowledge of the risk of harm

that allows the actor to discriminate between actions that are merely negligent or

even grossly negligent and those that are deliberately indifferent. Here, the district

court found that Appellant was required to show that the risk occurred frequently

so as to constitute a "norm" or a "routine." Such a rule would essentially vitiate

most cases of deliberate indifference. For example, it would rule out "deliberate

indifference" in the case of a prison official who places an inmate with another inmate who killed his last cellmate but did not do so routinely. So it is not simply a statistical matter. The "norm" or "routine" injury model does not hold up where the stakes for a fall are high are potentially catastrophic, as here.

A correctional official may be held liable under the Constitution for acting with "deliberate indifference" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and with such knowledge disregards that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); see also *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (quoting *Farmer*, 511 U.S. at 839).

Deliberate indifference has three components—evidence of: (1) a substantial risk of serious harm; (2) deliberate indifference to that risk; and (3) causation. *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013). To prevail, an inmate must show "conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (quotation omitted)). A plaintiff can make this showing by demonstrating either a "general threat" to inmates based on dangerous conditions in the prison or particular area of the prison, or by an individualized risk based on a "specific threat" to the prisoner. *Marbury*, 936 F.3d at 1233, 1235; see also *Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1320 (11th Cir. 2005).

Here, Dombrowski, working with huge 80-gallon kettles on a wet slippery kitchen floor was an individualized risk based on a "specific threat."

To establish the second element—deliberate indifference—a plaintiff must provide evidence that the defendant: (1) "was subjectively aware that the inmate was at risk of serious harm"; (2) "disregarded that risk"; and (3) "acted with 'subjective recklessness as used in the criminal law.'" *Wade*, 106 F.4th at 1255 (quoting *Farmer*, 511 U.S. at 839). Subjective awareness requires that the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007) (citing *Farmer*, 511 U.S. at 837). The determination whether a risk has been disregarded is objective: "[T]he [defendant] must have responded to the known risk in an unreasonable manner." *Marbury*, 936 F.3d at 1233; *Wade*, 106 F.4th at 1262. Here, the prison staff forcing Dombrowski, by threat, to work in an unsafe environment were the persons hired to enforce safety rules that they coerced him to disregard – and should be deemed to have a high level of awareness as to the risk of harm.

To sustain a claim, a plaintiff must show that the challenged conduct was "very unreasonable in light of a known risk" of harm or suffering. *Hardin v. Hayes*, 52 F.3d 934, 939 (11th Cir. 1995) (citing *Farmer*, 511 U.S. 836-837). Whether an officer was aware of a risk of serious harm may be deduced from

circumstantial evidence, including whether or not the "risk was obvious." *Farmer*, 511 U.S. at 842. For these "enforcers" of the safety rules, it clearly was.

"Finally, the plaintiff must show a 'necessary causal link' between the defendant's failure to act reasonably and the plaintiff's injury." *Marbury*, 936 F.3d at 1233 (quoting *Rodriguez*, 508 F.3d at 622–23). This causal connection requires that the defendant "(1) had the means substantially to improve the inmate's safety, (2) knew that the actions he undertook would be insufficient to provide the inmate with reasonable protection from violence, and (3) had other means available to him which he nevertheless disregarded." *Nelson v. Tompkins*, 89 F.4th 1289, 1298 (11th Cir. 2024) (quoting *Rodriguez*, 508 F.3d at 622); see also *Swint v. City of Wadley, Ala.*, 51 F. 3d 988, 999 (11th Cir. 1995) (connection may be personal participation, improper policy, or the lack of a policy). Prison officials violate the Eighth Amendment through "the unnecessary and wanton infliction of pain." *Farmer*, 511 U.S. at 836. But the question is not whether "food service workers routinely sustained serious injuries from slip-and-falls caused by unsafe footwear to the extent that such incidents were 'the norm.'" (ECF 105 at 14). Appellant Dombrowski was exposed to a *special* risk as the cook standing at the 80-gallon vessels with the downspout at the base splattering food and liquid onto the smooth floor. (ECF 87-1, Dombrowski Deposition at 18:12-16).

Here, Appellant not only fell himself in December of 2019, but he had seen

several other kitchen workers slip and fall in the kitchen wearing crocs.[8] The objective evidence is that the Appellees knew that Appellant, as the cook, had suffered a fall injury before, and knew that Dombrowski was required to wear special shoes, but coercively ordered him to work in dangerous conditions anyway. Appellee Cobb stated she knew that kitchen workers were supposed to wear safety boots which were not always supplied. (ECF 97-4 at ¶ 11, 12). She stated it was Appellee Wilson's job to make sure that everyone had safety boots but that Wilson did not do so. She testified that Security (Jelks being the security officer assigned to the kitchen), had the responsibility to make sure that kitchen workers without boots were removed from the kitchen. (ECF 87-7 at 31:22-32:7).

Appellee Cobb admitted the floors were wet and slippery (ECF 87-7 at 18:20-22) but denied it was a problem. As Appellee Cobb testified at deposition:

> Q. Okay. And in the kitchen -- I guess the kitchen is the place where the -- you have problems with slippery floors and hot liquids; is that correct?
>
> A. Not -- not really.
>
> Q. Not really?
>
> Q. And it's not a problem to have hot liquid splashing around and hot food?

---

[8] In its Order on Summary Judgment, the district court emphatically multiple prior falls as "prior isolated incidents" (ECF 105 at 14) and minimizes Appellant's report that "several people . . . fell in food service while . . . . [wearing] [c]rocs" as "unsubstantiated and unexplained." (ECF 105 at 13). The district court does not suggest what further explanation was called for but Dombrowski made clear that he personally witnessed several falls (ECF 87-1 at 19:13-16). And as for substantiation, there was ample evidence that the safety boots were required and that at least one witness other than Dombrowski, Vega-Marrero, recalled the floors "were often wet and slippery."

A. No, sir.

. . . .

Q. Okay. Is it a smooth surface?

A. Uh-huh.

. . . .

Q. Okay. But people who work in the kitchen are required to wear boots, correct?

A. Correct.

(87-7, Cobb Deposition at 20:20-22:14). However that general characterization ignores the special risk to Mr. Dombrowski in particular who is working in the cooking area. Mr. Dombrowski explains how the kitchen floors become dangerous to workers who have slick soles and work on wet slick surfaces:

> You have to realize our work is – we call it institutional cook. We deal with – our cooking is not just pans.· We use 80-gallon pots to cook our stuff, and it's got the downspout at the bottom.· So when we release the food, it splashes, these beans or whatever, the hot food.

(ECF 87-1, Dombrowski Deposition, at 18:12-16).

Other persons had a subjective awareness that there was a serious risk in a dangerous kitchen that having improper shoes with slick soles would result in harm, including serious harm. Fellow kitchen worker Jesus Vega-Marrero testified that "When Mr. Dombrowski slipped and fell, he was not wearing any special safety boots with non-slip soles for the kitchen floors which were often wet and slippery, but only the kind of "crocs" that other inmates were issued." (ECF 87-4,

Vega-Marrero declaration at 1, ¶ 5)

In *Phelps v. Duncan*, for example, a court declined to dismiss a case where, irrespective of whether the risk is one that occurs "routinely" or constitutes a norm, is obvious. 2018 WL 325201, at *3 (N.D. Fla. Jan. 8, 2018); *see also Farmer*, 511 U.S. at 842 (A factfinder "may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."). There, the court held that:

> [Phelps] alleges that he was required to try to work with boiling liquids in a tilt kettle while trying to avoid slipping into an open drain under his feet that was several inches deep, several feet long and several feet wide. Plaintiff has adequately plead enough to be given the chance to prove that the conditions under which he was forced to work were sufficiently serious to satisfy the "objective component" of the test from *Chandler v. Crosby*, 379 F.3d 1278 (11th Cir.2004), and a chance to satisfy *Chandler's* "subjective component" by proving that the Appellees knew of the risk and that their conduct was more than gross negligence. Thus, the Court declines to dismiss the Eighth Amendment claim under 28 U.S.C. § 1915(e)(2)(B).
>
> Also, while the Court agrees that Director Duncan cannot be held vicariously liable for the acts of her subordinates, plaintiff alleges more than just vicarious liability regarding her. Instead, he alleges that he and other inmates personally informed her about the dangerous condition and that she personally directed him to work under those conditions anyway. This is the type of personal control or direction required under *Monell v. Dep't of Soc. Servs.*, 436 658, 694 n. 58 (1979). Thus, the part of the Report and Recommendation that would dismiss the claims against Director Duncan is rejected.

2018 WL 325201, at *3. In the case of Appellee Director Wilson, she receives special notice because she is one of the persons who is required to enforce the rules raising a reasonable inference that she understands why the rules are necessary.

Appellees may be found deliberately indifferent in this case not only for the

reason that falls were routine, but for the reason expressed above in *Farmer v. Brennan*, "from the very fact that the risk was obvious." 511 U.S. at 842.

As the court held in *Barefield v. Dunn* held in the context of excessively violent prison conditions,

> [I]t is beyond debate that all reasonable prison officials, who had the power to make conditions of confinement constitutional or to substantially improve prisoner safety, were on notice that taking no action when knowingly faced with an indisputably excessive risk . . . from conditions of confinement constitutes a violation of the Eighth Amendment. And that is what Barefield has alleged with sufficient factual detail to render plausible. If those plausible allegations are true, the relevant legal principles clearly establish a constitutional violation.

*Barefield v. Dunn*, 688 F. Supp. 3d 1026, 1095 (M.D. Ala. 2023).

## II. Appellees Were Deliberately Indifferent in Two Ways: Creating the Risk of Serious Physical Harm and Failing to Mitigate the Harm by Waiting Hours to Access Medical Intervention.

The Eighth Amendment's prohibition against cruel and unusual punishment forbids knowingly compelling inmates to perform work beyond their strength, dangerous to their lives, or health or unduly painful. *Ray v. Mabry*, 556 F.2d 881, 882 (8th Cir. 1977) (per curiam); *Williams v. Norris*, 148 F.3d 983, 987 (8th Cir. 1998); *Lee*, 870 F. Supp. at 1100. A correctional official may be held liable under the Constitution for acting with "deliberate indifference" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and with such knowledge disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 828.

Here, Appellees were aware of a risk of serious harm in forcing Appellant to work in the kitchen without safety boots. Dombrowski made sure they knew he had a prior injury without safety boots. (ECF 97-1, Dombrowski Declaration at 3). Moreover, prison safety rules required proper work footwear be provided and worn. (See ECF 97-3, Elizabeth Mallard Stmt.). Appellees Cobb and Jelks were both present after the risk of harm was realized and doubled down on their original deliberate indifference by failing to act expediciously to secure medical aid.

### A. Appellees Were Aware of a Risk of Serious Harm in Forcing Appellant through Threats to Work without Safety Boots

The Eighth Amendment is implicated when a prisoner alleges a prison official compelled him to "perform physical labor which [was] beyond [his] strength, endanger[ed his life] or health, or cause[d] undue pain." *Berry v. Bunnell*, 39 F.3d 1056 (9th Cir.1994); *Ray v. Mabry*, 556 F.2d 881, 882 (8th Cir.1977).

In his affidavit, Mr. Dombrowski testified that:

> I told Cobb and Jelks that I would not work in the kitchen until I got the safety boots. I reminded them that I had previously suffered a bad fall trying to work in the resin shoes (crocs). Cobb and Jelks became angry and told me that if I refused to work, I *would* get a disciplinary report and *be sent to confinement for 60 days and lose all my gain time*. I knew that Officer Jelks had the authority to write disciplinary reports and refusal to work was considered a serious offense. I didn't expect any mercy. I couldn't afford to lose all my gain time and spend longer in prison. (*Emphasis added*).

(ECF 97-1 at ¶ 3). Appellant had asked all three appellants to provide him with safety boots and they responded with threats. But even in the face of those threats,

Dombrowski decided not to let the matter rest. Instead, he appealed to the Food Services Director, Appellee Wilson one last time. He testified that "on or about September 11, 2020, I raised the need for the safety boots again with Food Service Director, Chatara Wilson." (Id. at ¶ 4). Appellee Wilson's response to his appeal was concise: "I don't have time for this shit." (Id.).

The threats were real. The disciplinary rules and procedures as set forth in the Florida Administrative Code (FAC) are incorporated into the FDC staff training program (33-601.301(4) FAC) and are required to be provided to all inmates. (33-601.301(5) FAC). Disobeying a verbal or written order (Violation 6-1. 33-601.314, Section 6, FAC) can result in 30 days Disciplinary Confinement and loss of up to 60 days gain time. This can be repeated for each refusal. Insufficient Work (9-13) or Refusal to Work (9-16) can be punished by up to 30 days DC and 30 days loss of GT for each occurrence, depending on the time elapsed since the last violation. (33-601.314, Section 11). So the penalties for a continuing resistance to a work order are effectively infinite and could ultimately result in a loss of all gain time.

By forcing Mr. Dombrowski to work without safety boots with threats that he "*would*" get a disciplinary report and go to confinement and lose gain time, Appellees were aware they created a risk of serious harm. Dombrowski made sure they knew he had a prior slip and fall working in the kitchen without safety boots. (ECF 97-1, Dombrowski Declaration at ¶ 3). Moreover, prison safety rules

required safety boots. (See ECF 97-3, Elizabeth Mallard Stmt.).

In *Farmer*, the Supreme Court held:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id. at 837. However, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that a harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Id.* Such circumstantial evidence can include the repeated falls by others in the kitchen where the Appellant, Cobb and Jelks worked, the fall suffered previously by Dombrowski, and the official policy on the use of safety boots in the kitchen and the role of the supervisor and security officer in the kitchen in enforcing those rules, and Wilson's overall direction of Food Service for both Hamilton C.I. compounds.

All three Appellees had subjective awareness of the relevant risk both when forcing Dombrowski to work without safety boots (and Director Wilson's refusal to

intervene to ensure that boots were provided to Dombrowski) and, as to Cobb and Jelks, who were present at the scene of the injury, when failing to ensure that medical made a timely response to his injury. Dombrowski made sure the Appellees aware of the fall, his severe pain, and his inability to walk.

**B.  The District Court Erred in Failing to Find Appellees Cobb and Jelks Liable for Disregarding a Risk of Even More Serious Harm by Failing for Hours to Make Reasonable Efforts to Get a Timely Response by Medical Providers as Dombrowski Suffered in Pain.**

After Dombrowski fell and lay on the floor, crying with pain, Appellees Cobb and Jelks had an opportunity over four or five hours to somewhat mitigate the harm cause by their original deliberate indifference (and that of Wilson) by acting expediciously to secure medical help for Dombrowski. Dombrowski believed that he fell around 4:00 a.m., possibly 4:30 a.m. but it could have been as late as 5:15 a.m. He asked Officer Jelks to call medical. She said she would but apparently failed to do so. After 30 minutes went by, Dombrowski asked Officer Jelks again and she said Medical would come. (ECF 87-1 at 21:7-25). Although Jelks at some point promised to call medical, there is evidence that she did not do so, or at least did not reasonably follow up given that business in the kitchen continued as usual while Dombrowski lay crying in extreme pain unable to move from the bench where two inmates picked him up off the floor and moved him.[9]

---

[9] Jelks' credibility with a jury might be strained by the fact that in response to Appellant's Requests for Admissions, she denied that Dombrowski was wearing "Crocs" in the kitchen (ECF 97-4 at 7, ¶ 8) and that he was refused work boots (Id. at 0, ¶ 30) – as against the observation of

Against their claims that they did not believe Dombrowski was really seriously injured, a jury could weigh their coercive conduct in forcing him to work under patently unsafe conditions to begin with and their general disregard for Dombrowski as a human being, someone the safety rules they were supposed to enforce were meant to protect, as the basis for their unconcern.

Cobb and Jelks would have known that if medical staff became involved they might find themselves in trouble for failing to provide safety boots, even after being informed by the Appellant that he previously suffered a fall due to not having safety boots for working in the kitchen. After the fall occurred, Appellees went about their business while Dombrowski lay in pain for at least four hours.

Dombrowski asked for help during this time, and Appellees Cobb and Jelks simply brushed him off and did not follow up with medical. When Medical finally came, it was because hours later inmates had called out to Sgt. Jackie Morgan who was doing rounds outside the chow hall. (ECF 97-1 at ¶ 6).

"The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay." *Bozeman v. Orum*, 422 F.3d 1265, 1272 n. 11 (11th Cir. 2005) (quoting *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994)). Appellees ignored Dombrowski's second request for

---

the nurse who came to get him that he was wearing "Crocs" (ECF 97-5, Fongeallaz Depo at 12:6-8) and the statement of Assistant Warden Mallard that it was the duty of kitchen staff to make sure that all kitchen workers are wearing boots. (ECF 97-3).

medical help, if not the first, and given the seriousness of his medical need, evident

from the level of pain and inability to walk, shows a disregard for that medical

need. Medical did not come until Sgt. Morgan called for medical hours later, and

arrived soon after with a stretcher. See *Brown v. Hughes*, 894 F.2d 1533, 1539

(11th Cir. 1990) (finding factual dispute for jury where prison guard "promised to

send someone to look at" prisoner's significant foot injury "but never did").

The Eleventh Circuit has repeatedly found that "an official acts with

deliberate indifference when he or she knows that an inmate is in serious need of

medical care, but he fails or refuses to obtain medical treatment for the inmate."

*Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997); *see also*

*Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989) (noting that "knowledge of the

need for medical care and intentional refusal to provide that care constitute

deliberate indifference"). Even where medical care is ultimately provided, a prison

official may nonetheless act with deliberate indifference by delaying the treatment

of serious medical needs, even for a period of hours, though the reason for the

delay and the nature of the medical need is relevant in determining what type of

delay is constitutionally intolerable. *Harris v. Coweta County*, 21 F.3d 388, 393-94

(11th Cir. 1994); *Brown*, 894 F.2d at 1537-39. The Eleventh Circuit also has held

that deliberate indifference may be established by a showing of grossly inadequate

care as well as by a decision to take an easier but less efficacious course of

treatment. *Steele v. Shah*, 87 F.3d 1266, 1269-70 (11th Cir. 1996); *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989). Moreover, "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Mandel*, 888 F.2d at 789; *accord Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985). "In the Eleventh Circuit, "an unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference." *Reid v. Streit*, 697 Fed.Appx. 968, 973 (11th Cir. 2017) (quoting *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990)).

Appellees acknowledge that Dombrowski established prong one: the serious medical condition. (ECF 87 at 11). Dombrowski also shows a causal link to the harm suffered. "A prisoner who suffers severe pain for a prolonged period of time due to a prison official's inaction satisfies the injury requirement of an Eighth Amendment claim, even if the delay in receiving treatment does not cause an irreversible deterioration of the inmate's condition." *Melton v. Abston*, 841 F.3d 1207, 1227 (11th Cir. 2016) ("[O]fficials violate an inmate's Eighth Amendment rights by failing to provide, unreasonably delaying or providing grossly inadequate medical care that causes an inmate to 'needlessly suffer' severe pain.") *See Rodriguez v. Asencio*, No. 3:17cv155-RV-HTC, at *24 (N.D. Fla. 2019).

**III The District Court Erred in Failing to Send This Case to a Jury Where Appellees Have Disputed Virtually Every Fact Alleged by Appellant.**

If there were not already a case for a jury, as with a single voice, the Appellees have disputed virtually every fact alleged by Appellant. In their responses to requests for admissions, Appellees Cobb, Jelks, and Wilson unequivocally deny a number of the very propositions on which they rely in their Motion for Summary Judgment. For instance, Appellee Cobb unequivocally denied that standard prison footwear included "crocs." (ECF 97-4 at 2, ¶ 7). She denied that standard prison footwear in Florida prisons is not safe for kitchen work (Id. at 2, ¶ 8). She denied that kitchen workers in Florida prisons often work on slippery surfaces. (Id. at 2, ¶ 9). She denied that kitchen workers in Florida prisons may be splattered by hot food and liquid. (Id. at 2, ¶ 10). She denied that "Refusal to Work" can result in a disciplinary charge. (Id. at 2, ¶ 17). She denied that "Refusal to Work" can result in placement in confinement (Id. at 2-3, ¶ 18). She denied that "Refusal to Work" can result in loss of gain time. (Id. at 3, ¶ 19). She denied that Appellant was told to report to Food Service as a cook in September 2020. (Id. at 3, ¶ 24). She denied that he asked to be provided with work boots to work in the kitchen. (Id. at 3, ¶ 27). She denied that he was told that there were no boots available for him. (Id. at 3, ¶ 28). She denied being present at the scene of his fall injury in September 2020 (Id. at 4, ¶ 31). She denied that medical personnel were called but did not immediately come to the 2020 fall injury scene. (Id. at 4, ¶ 33). She denied Appellant suffered a broken femur in his fall. (Id. at 4, ¶ 39).

The other Appellees make very similar denials. Appellee Jelks unequivocally denied that standard prison footwear included "crocs." (ECF 97-4, Requests for Admissions to Appellee Jelks at 7, ¶ 7). She denied that standard prison footwear in Florida prisons is not safe for kitchen work. (Id. at 7, ¶ 9). She denied that kitchen workers in Florida prisons may be splattered by hot food and liquid. (Id. at 7, ¶ 11). She denied that kitchen workers in Florida prisons are normally provided with work boots. (Id. at 7, ¶ 12). She denied that a "Refusal to Work" can result in a disciplinary charge. (Id. at 8, ¶ 19). She denied that a "Refusal to Work" can result in placement in confinement. (Id. at 8, ¶ 20) She denied that "Refusal to Work" can result in loss of gain time. (Id. at 8, ¶ 21). She denied that the Appellant asked to provided with work boots to work in the kitchen. (Id. at 8, ¶ 29). She denied that Appellant was told that there were no boots available for him (Id. at 9, ¶ 30). She denied being present at the scene of Appellant fall injury in September 2020. (Id. at 9, ¶ 33). She denied that medical personnel were called but did not immediately come to the 2020 fall injury scene. (Id. at 9, ¶ 35). She denied that the Appellant appeared to be suffering pain after his fall injury in September 2020. (Id. at 9, ¶ 36). She denied that Appellant suffered a broken femur in his fall on September 13, 2020. (Id. at 9, ¶ 41).

Appellee Wilson unequivocally denied that Appellant Dombrowski complained to her about having to work in unsafe footwear. (ECF 97-4, Requests

for Admissions to Appellee Wilson, at 12, ¶ 2). She denied kitchen workers in Florida often work on slippery surfaces. (Id. at 13, ¶ 9). She denied they may be splattered by hot food and liquid. (Id. at 13, ¶ 10). She denied kitchen workers in Florida prisons are normally provided work boots. (Id. at 13, ¶ 11). She denied that "refusal to work" can result in a disciplinary charge. (Id. at 13, ¶ 17). She denied it can result in confinement. (Id. at 13-14, ¶ 18). She denied it can result in loss of gain time. (Id. at 14, ¶ 19). She denied that Appellant was required to work in the kitchen without work boots. (Id. at 14, ¶ 20). She denied he fell while working in the kitchen without work boots. (Id. at 14, ¶ 21). She denied Appellant asked to be provided work boots. (Id. at 14, ¶ 27). She denied Appellant was told there were no boots available for him. (Id. at 14, ¶ 28). She denied that Appellant's footwear provided no protection from splashes or slips. (Id. at 15, ¶ 34).

Specious and disingenuous unqualified denials of facts, where solid, unambiguous evidence (including Appellees' own testimony) exists to the contrary, can certainly undermine the credibility of Appellees' defenses. It also highlights actual disputes of fact that are grist for a jury's mill such that the case cannot be resolved on summary judgment.

**IV The District Court Erred in Finding that the Risk to Which Appellees Exposed Dombrowski Did Not, as a Matter of Law, Constitute a "Risk of Serious Harm" under Constitutional Law, Such that Appellees Are Entitled to Qualified Immunity.**

In granting qualified immunity to Appellees on the issue of deliberate

indifference, the district court states:

> Accepting as true that Appellees knew of prior isolated incidents yet gave Plaintiff an ultimatum—work in the kitchen wearing crocs or face a DR—there is no evidence that inmate food service workers routinely sustained serious injuries from slip-and-falls caused by unsafe footwear to the extent that such incidents were "the norm." *See Purcell*, 400 F.3d at 1324 ("'Reasonable care' under tort law is not the same thing as reasonable safety within the meaning of the federal Constitution."). On this evidence, the Court cannot conclude Appellees were aware of a substantial risk of serious harm and, with such knowledge, were deliberately indifferent to the risk. Accordingly, they are entitled to qualified immunity on this claim.

(ECF 105, Order on Summary Judgment, at 14).

If qualified immunity ever had a legitimate basis, it misses the mark here. The district court adopts a number of inferences in the light most favorable to the moving party. The court also assumes a jury would find Appellees credible in their denials of subjective knowledge of the risk of harm where they are using threats of confinement and longer imprisonment to subvert the safety rules they were assigned to monitor and enforce. The Eleventh Circuit in *Purcell* does not purport to establish a "floor" of liability for Eighth Amendment purposes. *Purcell*, 400 F.3d at 1323. The result in *Purcell* is based on specific facts – including that the jail was not understaffed, that serious inmate violence was not the "norm," that the risk of harm was not linked to "a recurring specific cause" and that the jail had a history of penalizing episodes of harm.

*Brooks v. Warden*, a precedential case cited in district court decisions, suggests that there are other factors than whether the risk of harm is "routine" or

"the norm." In *Brooks*, an inmate was threatened by another inmate and reported the threats. Sometime later he was attacked by that inmate and hospitalized for three days as a result. The court in *Brooks* found that

> To prevail on such a claim brought under § 1983, the plaintiff must show: (1) a substantial risk of serious harm; (2) the Appellees' deliberate indifference to that risk; and (3) a causal connection between the Appellees' conduct and the Eighth Amendment violation. See id. The first element, a substantial risk of serious harm, is evaluated using an objective standard. Id. There must be a "strong likelihood" of injury, "rather than a mere possibility," before an official's failure to act can constitute deliberate indifference. *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir.1990) (per curiam) (*quoting Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir.1989)).

*Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015). Clearly factors can exist in a particular situation that make an injury likely to occur in special circumstances even if it has not become the norm in the overall environment.

In his deposition of June 13, 2023, Dombrowski testified:

> You have to realize our work is -- we call it· institutional cook.· We deal with -- our cooking is not just· pans.· We use 80-gallon pots to cook our stuff, and it's got· the downspout at the bottom.· So when we release the food, it· splashes, these beans or whatever, the hot food.· Well,· you've seen a pair of these Crocs.· They're full of holes. I· guess they sell them in the real world.· I mean, well, you· know what Crocs looks like.· Are you --

> Q.· ·Yes.

> A.· ·Okay.· So I'm cooking with these, and it's burning· my feet, and I'm steadily complaining, "Listen, we got to· find a pair of boots for me."

> They're not -- they're not doing it.· So --

> . . . .

> Q.· ·I'm going to ask a follow-up question.

A.· ·Yeah, ask it, because I kind of got lost.

Q.· ·Sure.· So this is September 2020, and you went back· to work after Covid you said.

A.· ·Uh-huh.

Q.· ·And you worked the next three to four days.· Were· there any incidents in those three to four days?

A.· ·Yeah, burning my feet from -- and slipping around.· Yeah, because the floors, basically, are kind of like -- they· are just slick floors.· They're not good.· It's an aging· building.

Q.· ·Did you see anybody else fall while you were doing· your work?

A.· ·Yeah.· There's several people that's fell in food· service while I worked.

Q.· ·Did those people get boots?

A.· ·No.· They had Crocs.

Q.· ·All right.· Well, bring me to -- let me see.· I'm· just looking at your complaint.

Okay.· So bring me to the incident that you are· talking about in your complaint in September of 2020 where· you fell.

A.· ·Okay.· So to my recall now, I was -- I came to work· on September 13th, maybe 3:00 in the morning.· I knew that the meal of the morning was to make hot -- make oatmeal, and· I believe they were having peanut butter sandwiches.· Because· of the Covid, they didn't have a baker to make coffee cake.

So I was using the 80-gallon kettle to make oatmeal,· and I was rushing to get some pans, and when I came around· the corner, my feet came out from behind -- under me, and I· hit the -- I hit the floor.

I got back up.· I started to pour the oatmeal, and· again my foot slipped.

And you would have to have a picture of the area· that I'm talking about.· The kettle sits in an area that it's· 4 inches lower than the rest of the floor.· There's a 4-inch· lip, and that is where I slipped on that lip and caught

the· edge of it and hurt my -- and at that point I -- I was unable· to walk on this leg.

(ECF 87-1, Dombrowski Deposition at 17: to 19:15).

So there existed particular dangerous conditions in that particular kitchen on that particular day that created a particular danger that was not being addressed. And to that dangerous condition, another factor has to be added – the factor of coercion. To the extent that the issue is "notice" of a dangerous condition, the threat of intentional punishment if he doesn't work without safety gear goes "deliberate indifference" one better. Appellees are forcing Dombrowski to work without safety gear against his better judgment by threatening him with a punishment that will increase his time in prison by years. And it wasn't just that he might face a Disciplinary Report (DR). It was a direct threat: "They threatened to put me in confinement if I didn't work." (Id. at 43:7-8).

The defense of qualified immunity is not available to defendants to the extent they are deliberately indifferent to serious medical needs. It is well settled that the "deliberate indifference" to the serious medical needs of a detainee violates clearly established law. *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994); *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997); see also *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989) ("This court has consistently held that knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference."). "[D]eliberate

indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment." Id. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 182-83 (1976)).

In the Eleventh Circuit, when a plaintiff's allegations establish an Eighth Amendment violation deemed cruel and unusual punishment, qualified immunity does not attach. See *Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002) ("Having determined that the [Appellees'] alleged beating violated [plaintiff's] Eighth Amendment rights, we conclude that no qualified immunity defense was available to the [Appellees]"); see also *Ash v. Landrum*, 819 Fed.Appx. 770, 774 (11th Cir. 2020) ("[A]s [plaintiff's] allegations establish an Eighth Amendment violation, we conclude that the district court erred in determining that the [Appellees] were entitled to qualified immunity"); *Bowden v. Stokley*, 576 Fed.Appx. 951, 955 (11th Cir. 2014) ("[B]ecause a reasonable jury could find [Appellees] violated [plaintiff's] Eighth Amendment rights, [Appellees] are not entitled to qualified immunity .... [W]here the plaintiff has sufficiently alleged or shown a material dispute of fact as to an excessive force claim, summary judgment based on qualified immunity is not appropriate") (citation omitted); and *Fennell v. Gilstrap*, 559 F.3d 1212, 1217 (11th Cir. 2009) ("For claims of excessive force in violation of the Eighth . . . Amendment [] ... a plaintiff can overcome a defense of qualified immunity by showing only the first prong, that his Eighth . . .

Amendment rights have been violated . . . . We created this rule because, for an excessive-force violation of the Eighth . . . Amendment[], the subjective element required to establish [the constitutional violation] is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution." *Herbert v. Miller*, CV 619-052, at *15-17 (S.D. Ga. Mar. 14, 2022).

## K. Conclusion

Based on the argument and citations to authority, the proper remedy is to vacate the judgment and remand the case for further proceedings.

## L.  Certificate of Compliance

Undersigned counsel hereby certify pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B)(i) that the Initial Brief complies with the type-volume limitation. The number of words in the Initial Brief is 11440.

## M.  Certificate of Service

I HEREBY CERTIFY a true and correct copy of the foregoing was served electronically on March 20, 2025, and by mail on:

> Broderick Taylor, Esq.
> Office of the Attorney General
> 1300 Riverplace Blvd., Ste. 405
> Jacksonville, FL 32207
>
> Respectfully submitted,
>
> s/JAMES V. COOK
> FL Bar No. 966843

Law Office of James Cook
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 222-8080; (850) 561-0836 fax
cookjv@gmail.com

Counsel for Appellant